PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE PINEY RUN PRESERVATION
ASSOCIATION,
                    *Plaintiff-Appellee,*

            v.

COUNTY COMMISSIONERS OF CARROLL
COUNTY, MARYLAND,
                    *Defendant-Appellant.*

ASSOCIATION OF METROPOLITAN
SEWERAGE AGENCIES; WATER
ENVIRONMENT FEDERATION;
MARYLAND ASSOCIATION OF
MUNICIPAL WASTEWATER AGENCIES,
INCORPORATED; VIRGINIA
ASSOCIATION OF MUNICIPAL
WASTEWATER AGENCIES,
INCORPORATED; WEST VIRGINIA
MUNICIPAL WATER QUALITY
ASSOCIATION, INCORPORATED;
AMERICAN CHEMISTRY COUNCIL;
AMERICAN FOREST AND PAPER
ASSOCIATION; CHAMBER OF
COMMERCE OF THE UNITED STATES OF
AMERICA; GENERAL ELECTRIC
COMPANY; NATIONAL ASSOCIATION OF
MANUFACTURERS; UTILITY WATER
ACT GROUP; VIRGINIA
MANUFACTURERS ASSOCIATION;

No. 00-1283

M.A.D.E. IN MARYLAND;
ALLIANCE OF AUTOMOBILE
MANUFACTURERS; AMERICAN IRON AND
STEEL INSTITUTE; AMERICAN
PETROLEUM INSTITUTE;
ENVIRONMENTAL FEDERATION OF
OKLAHOMA; MICHIGAN
MANUFACTURERS ASSOCIATIONS;
MISSISSIPPI MANUFACTURERS
ASSOCIATION; NATIONAL
PETROCHEMICAL AND REFINERS
ASSOCIATION; NUCLEAR ENERGY
INSTITUTE; WESTERN STATES
PETROLEUM ASSOCIATION,
*Amici Curiae.*

THE PINEY RUN PRESERVATION
ASSOCIATION,
*Plaintiff-Appellant,*

v.

COUNTY COMMISSIONERS OF CARROLL
COUNTY, MARYLAND,
*Defendant-Appellee.*

ASSOCIATION OF METROPOLITAN
SEWERAGE AGENCIES; WATER
ENVIRONMENT FEDERATION;
MARYLAND ASSOCIATION OF
MUNICIPAL WASTEWATER AGENCIES,
INCORPORATED; VIRGINIA
ASSOCIATION OF MUNICIPAL
WASTEWATER AGENCIES,
INCORPORATED; WEST VIRGINIA
MUNICIPAL WATER QUALITY
ASSOCIATION, INCORPORATED;

No. 00-1322

AMERICAN CHEMISTRY COUNCIL;
AMERICAN FOREST AND PAPER
ASSOCIATION; CHAMBER OF
COMMERCE OF THE UNITED STATES OF
AMERICA; GENERAL ELECTRIC
COMPANY; NATIONAL ASSOCIATION OF
MANUFACTURERS; UTILITY WATER
ACT GROUP; VIRGINIA
MANUFACTURERS ASSOCIATION;
M.A.D.E. IN MARYLAND;
ALLIANCE OF AUTOMOBILE
MANUFACTURERS; AMERICAN IRON AND
STEEL INSTITUTE; AMERICAN
PETROLEUM INSTITUTE;
ENVIRONMENTAL FEDERATION OF
OKLAHOMA; MICHIGAN
MANUFACTURERS ASSOCIATIONS;
MISSISSIPPI MANUFACTURERS
ASSOCIATION; NATIONAL
PETROCHEMICAL AND REFINERS
ASSOCIATION; NUCLEAR ENERGY
INSTITUTE; WESTERN STATES
PETROLEUM ASSOCIATION,
                              *Amici Curiae*.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Joseph H. Young, Senior District Judge.
(CA-98-3124-Y)

Argued: April 5, 2001

Decided: October 10, 2001

Before WILKINS, KING, and GREGORY, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Wilkins and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Linda S. Woolf, GOODELL, DEVRIES, LEECH & GRAY, L.L.P., Baltimore, Maryland, for Appellant. Christopher Donald Pomeroy, MCGUIRE WOODS, L.L.P., Richmond, Virginia, for Amici Curiae State Associations. Guerdon Macy Nelson, Towson, Maryland, for Appellee. **ON BRIEF:** Michael B. MacWilliams, Ian Gallacher, GOODELL, DEVRIES, LEECH & GRAY, L.L.P., Baltimore, Maryland, for Appellant. F. Paul Calamita, MCGUIRE WOODS, L.L.P., Richmond, Virginia, for Amici Curiae State Associations. D. Randall Benn, Paul C. Freeman, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P., Washington, D.C., for Amici Curiae Sewerage Agencies, et al. James N. Christman, HUNTON & WILLIAMS, Richmond, Virginia, for Amici Curiae Industry Groups. Robert G. Smith, Anthony M. Carey, VENABLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for Amicus Curiae M.A.D.E. in Maryland. Scott M. DuBoff, Kenneth S. Kaufman, WRIGHT & TALISMAN, P.C., Washington, D.C., for Amici Curiae Automobile Manufacturers, et al.

---

**OPINION**

KING, Circuit Judge:

The Piney Run Preservation Association sued the Commissioners of Carroll County, Maryland, claiming that a county-operated waste treatment plant was discharging warm water into a local stream, Piney Run, in violation of the Clean Water Act. The district court construed the plant's NPDES permit as not prohibiting the discharge of heat. Nonetheless, the court decided that the Commissioners were liable under the Clean Water Act for the discharge of pollutants not expressly authorized by the permit. On appeal, the Commissioners maintain that the "permit shield" defense, embodied in 33 U.S.C. § 1342(k), bars suit against a permit holder for the discharge of pollu-

tants not expressly listed in the permit. Although we do not accept the Commissioners' position on the permit shield defense, we also disagree with the district court's interpretation of the Clean Water Act. Utilizing the two-part test spelled out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,[1] 467 U.S. 837 (1984), we adhere to the interpretation provided by the EPA. We therefore view the NPDES permit as shielding its holder from liability under the Clean Water Act as long as (1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was granted. Applying this rule, we conclude that the Commissioners did not violate the Clean Water Act because (1) they complied with the discharge limitations and reporting requirements of their permit, and (2) their discharges of heat were within the reasonable contemplation of the permitting authority at the time the permit was issued. Accordingly, we vacate the judgment of the district court, and we remand for entry of judgment in favor of the Commissioners.

I.

Piney Run is a small stream with its headwaters near the border of Carroll and Baltimore counties in Maryland. The Maryland Department of the Environment ("MDE") has classified Piney Run as a Class III-P stream, which means that it is protected as a source of public drinking water and as a body capable of supporting a self-sustaining trout population. *See* Md. Regs. Code ("COMAR") tit. 26, § 26.08.02.02(B)(5). Carroll County operates the Hampstead Wastewater Treatment Plant ("Plant"), which serves approximately 4200 residential and commercial users. As part of the treatment process, the Plant discharges effluent, i.e., treated wastewater, into Piney Run.

Because of the Plant's discharge of effluent into Piney Run, the Plant is subject to the Clean Water Act ("CWA"). *See* 33 U.S.C.

---

[1]The *Chevron* doctrine provides that interpretations of governing statutes by authorized administrative agencies receive deference from the courts if (1) the statutory language is ambiguous and (2) the administrative interpretation is reasonable. 467 U.S. at 844.

§ 1311(a). Under the CWA, dischargers must operate pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit obtained from either the Environmental Protection Agency ("EPA") or an authorized state agency. *See id.* §§ 1311(a), 1342(a), (c); *see also* Md. Code Ann. Envir. § 9-323. Beginning in 1975, the Plant has operated under a series of NPDES permits granted by the MDE as the authorized state agency. The most recent NPDES permit was issued to the Plant in 1990.

Under the CWA, the various states are required to promulgate water quality standards for certain waters within their borders. *See* 33 U.S.C. § 1313. Such standards denote designated uses of particular bodies of water and establish water quality criteria designed to protect those uses. *See* 40 C.F.R. §§ 131.10(a), 131.11. In order to grant a permit or a permit modification, the MDE must determine that the discharger will not violate these water quality standards. *See* Md. Code Ann. Envir. § 9-324(a); COMAR tit. 26, § 26.08.04.02(A)(1)(b).

The Piney Run Preservation Association ("Association"), which is dedicated to the protection of Piney Run, filed this lawsuit in the District of Maryland in 1998. The Association sued the Commissioners under section 505 of the CWA, 33 U.S.C. § 1365(a),[2] claiming that the Plant's NPDES permit limited the amount of heated effluent it could discharge into Piney Run, and that the Plant regularly exceeded this limit.[3] The Plant's 1990 permit contained express limitations on

---

[2]Section 505 provides, in pertinent part, that "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a). This provision of the CWA allows citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit" and "a successful suit may result in the award of injunctive relief and the imposition of civil penalties payable to the United States Treasury." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000).

[3]In 1991, the Plant petitioned the MDE for a modification of its 1990 permit to allow it to increase its daily discharge of effluent. The MDE proposed granting the modification, but several neighboring landowners challenged the change and contended that the MDE had not sufficiently

the amount of certain pollutants that may be discharged. Heat, a statutory pollutant under the CWA, was not listed in the 1990 permit as one of these pollutants.[4] *See id.* § 1362(6). In its lawsuit, the Association claimed that a footnote of the Plant's NPDES permit flatly prohibited the discharge of any pollutants that were not expressly listed in the permit. In the alternative, the Association argued that a permit holder may be liable under the CWA for the discharge of any pollutant not expressly allowed by its permit. The Association claimed that under either of these theories, the Plant was in violation of the CWA if it discharged any level of heat whatsoever. In May 1999, the district court construed the Commissioners' permit as allowing for the discharge of heat, but held that the CWA prohibits the discharge of any pollutant that is not limited by the permit. Using Maryland water quality standards, the court concluded that heat constituted a pollutant in violation of the CWA when effluent was discharged "with a temperature exceeding the greater of either 68 degrees [Fahrenheit] or the ambient temperature of Piney Run." *Piney Run Pres. Ass'n. v. County*

---

analyzed whether the Plant would comply with state water quality temperature standards in discharging the increased effluent. Although the MDE adjudicatory bodies and the Circuit Court for Baltimore County dismissed the landowners' claim, the Court of Special Appeals of Maryland upheld the landowners' challenge and remanded the case to the MDE to measure the ambient temperature of Piney Run and to ascertain whether the Plant violated Maryland water quality standards at its current or proposed levels of discharge. Therefore, because the Plant has not received final approval for a modified permit, the 1990 permit is the relevant permit for this case.

[4]Although the Association asserts that the Plant discharged heat in violation of the NPDES permit, the crux of the Association's challenge is that the Plant discharged water into Piney Run that was warmer than the baseline temperature, or "ambient temperature," of the stream. In essence, the Association contends that heat was discharged into Piney Run in violation of the CWA any time the temperature of the water discharged exceeded that of Piney Run, even if the difference in temperature between the two was slight. For example, the Association claims that the Commissioners violated the CWA even though the Plant's effluent was less than ten degrees Fahrenheit warmer than the temperature of Piney Run, and the discharged water was never measured as exceeding approximately 75.2 degrees Fahrenheit.

*Comm'rs.*, 82 F. Supp. 2d 464, 466 (D. Md. 2000) (citing COMAR tit. 26, § 26.08.02.03-3E). The court then calculated the "ambient temperature" of the stream, and found on partial summary judgment that the Commissioners had violated the CWA on 183 occasions.[5] In January 2000, the court conducted a bench trial in connection with the discharges in dispute, and it found an additional 107 CWA violations against the Commissioners. Accordingly, the court in February 2000 entered judgment for the Association, enjoined the Commissioners from further violations, assessed them $400,000 in civil penalties payable to the United States Treasury, and awarded the Association its litigation costs and reasonable attorneys' fees.

Both the Association and the Commissioners appeal from the district court's final order of February 10, 2000. The Association claims that the district court erred in holding that the Plant only violated the CWA when its discharge of heat exceeded state temperature standards. It contends that the Plant violated the CWA whenever it discharged any level of heat whatsoever. Accordingly, the Association seeks remand of this case on the issue of damages. The Commissioners, on the other hand, claim that the permit shield defense in 33 U.S.C. § 1342(k) bars holding a permit holder liable for the discharge of pollutants not expressly regulated by the permit.[6] The Commission-

---

[5]The Commissioners subsequently moved for reconsideration by the district court of its summary judgment ruling or, in the alternative, for certification of an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). In order to grant certification under § 1292(b), a district court must find that the order at issue "involves a controlling question of law as to which there is substantial ground for difference of opinion." The district court denied the Commissioners' motion to reconsider, but properly certified its summary judgment ruling for interlocutory appeal. On August 30, 1999, however, we denied the Commissioners' petition for interlocutory review. The Commissioners then filed a second motion for reconsideration in the district court, which was also denied.

[6]The permit shield defense is derived from the provisions of 33 U.S.C. § 1342(k), which provides:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health.

ers also challenge the Article III standing of the Association to sue, and they assert that the doctrine of primary jurisdiction precludes the district court's findings with respect to the ambient temperature of Piney Run.[7] We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The Commissioners claim that the Association lacks Article III standing. Pursuant to Article III of the Constitution, federal courts are restricted to the adjudication of "cases" and "controversies." The standing requirement therefore "ensures that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000). Moreover, the standing inquiry also "tends to assure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). In analyzing a decision on Article III standing, we review the district court's factual findings for clear error. We consider the legal question of whether the Association possesses standing to sue as a de novo matter. *See Marshall v. Meadows*, 105 F.3d 904, 905-06 (4th Cir. 1997).

---

[7]The doctrine of primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). The doctrine has been deemed to apply in circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency. *See, e.g.*, *American Auto. Mfrs. Ass'n. v. Mass. Dept. of Envt'l. Prot.*, 163 F.3d 74, 81 (1st Cir. 1998). In this case, the Commissioners contend that the district court should have deferred to the MDE to calculate the ambient temperature of Piney Run. Although the Commissioners' point may be compelling, we need not reach this issue because the ambient temperature of Piney Run has no bearing on our disposition of this appeal.

An association, as the representative of its members who have been harmed, possesses standing to sue if it can show: (1) at least one member would otherwise have individual standing, (2) the interests at stake in the litigation are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). On appeal, the Commissioners only contest the first prong of this three-part test, i.e., whether any member of the Association has individual standing to sue. An individual possesses Article III standing if (1) he or she has suffered an "injury in fact," (2) that is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision. *See Laidlaw*, 528 U.S. at 180-81. In this proceeding, the Commissioners challenge the first two elements of the individual standing test: they assert that no member of the Association has suffered an "injury in fact," and that even if an Association member has suffered such an injury, it is not "fairly traceable" to the Plant's operation. They correctly point out that the elements of standing are "not mere pleading requirements," but rather must be supported by sufficient evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

A plaintiff can show an "injury in fact" when he or she suffers "an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Gaston Copper*, 204 F.3d at 154; *see also Defenders of Wildlife*, 504 U.S. at 560. In an environmental case, the question is whether the plaintiff has suffered an injury, as opposed to whether the environment has actually been harmed. *See Laidlaw*, 528 U.S. at 181. Specifically, a plaintiff need only show that he used the affected area, and that he is an individual "for whom the aesthetic and recreational values of the area [are] lessened" by the defendant's activity. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972); *see also Laidlaw*, 528 U.S. at 184 (holding that plaintiffs had established an injury in fact because the challenged activity directly affected their "recreational, aesthetic, and economic interests"); *Defenders of Wildlife*, 504 U.S. at 562-63 ("[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purpose of standing."); *Gaston Copper*, 204 F.3d at 159 (concluding that individuals'

allegations that they would make greater recreational use of waterway except for concern over defendant's discharges sufficient for injury in fact).

In this case, Dorothy Rowland, a member of the Association, is able to show that she has suffered an injury in fact. Piney Run flows through Rowland's property. She testified that when she purchased her property in 1967, Piney Run was "very pristine," but that in the last several years the stream had acquired a high concentration of green algae. Rowland stated that the green algae significantly interfered with her use and enjoyment of Piney Run. For example, the algae made the stream's rocks slippery, and therefore difficult to cross. Because the water is no longer clear, she stopped allowing her horses to drink from Piney Run. Further, according to Rowland, the green algae made the stream less desirable to observe. In sum, Rowland demonstrated that her enjoyment of Piney Run has been diminished, and accordingly, she has sufficiently shown an "injury in fact."

Rowland can also show that her injury was "fairly traceable" to the Plant's operation. The plaintiff's injury must be fairly traceable to the challenged action of the defendant and not the result of some independent action. *See, e.g.*, *Defenders of Wildlife*, 504 U.S. at 561. The Commissioners maintain that the Association failed to provide sufficient scientific evidence that the concentration of green algae in Piney Run was caused by the Plant's discharge of heat. According to the Commissioners, the Association had to show that, but for the Plant's operation, the algae would not have developed in the stream. The Commissioners, however, misapprehend what the Association must demonstrate to show traceability. Traceability "does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs." *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (internal quotation marks omitted); *see also Gaston Copper*, 204 F.3d at 161 (same). Rather, a plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *Watkins*, 954 F.2d at 980 (internal quotation marks omitted); *see also Gaston Copper*, 204 F.3d at 161 (same).

In this case, the Association presented evidence that the Plant is discharging heat into Piney Run. Dr. Stauffer, a professor of ichthyol-

ogy (the study of fish), testified that heat can cause green algae to prolif-erate.[8] Rowland therefore has sufficiently shown that her alleged injury is "fairly traceable" to the challenged actions of the Plant. Row-land has demonstrated that she would possess individual standing if she were to sue the Commissioners for unlawfully operating the Plant. Because Rowland would have individual standing, the Association has standing to sue as a representative of its members.

### III.

We turn now to the district court's interpretation and application of the CWA. The court found that the Plant's NPDES permit contained no prohibition on discharging heat, but concluded that the Plant was liable under the CWA because the discharge of heat was not expressly allowed by the permit. We are, however, constrained to disagree. In these circumstances, because the Commissioners adequately disclosed that the Plant was discharging heat and because their discharges were within the reasonable contemplation of the MDE during the permit application process, the NPDES permit allowed the Plant to discharge heat. To explain our view on this point, a brief overview of the history and structure of the CWA is required.

### A.

Prior to enactment of the CWA in 1972, the Water Pollution Con-trol Act of 1948, as amended by the Water Quality Act of 1965, was the primary means of federal regulation of water pollution. *See gener-ally EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202 (1976); Martin A. McCrory, *Standing in the Ever-Changing Stream: The Clean Water Act, Article III Standing, and Post-Compliance Adjudication*, 20 Stan. Envtl. L.J. 73, 79-81 (2001).

---

[8]The Commissioners contend that the district court abused its discre-tion in allowing Dr. Stauffer to opine that the Plant's discharge of heat was affecting Piney Run's trout population. Specifically, the Commis-sioners claim that Dr. Stauffer's testimony did not meet the standards for admissibility. Regardless, because of the broad discretion accorded trial courts in such matters, and due to Dr. Stauffer's qualifications and the nature of his testimony, it was not erroneous for the district court to con-sider his evidence.

Under this regulatory scheme, states were required to promulgate water quality standards for certain bodies of water within their borders. *See Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000). Operators could discharge pollutants so long as their discharges did not reduce water quality below these standards. This water quality standard scheme, however, was plagued with many problems. Significantly, it was often difficult to formulate precise water quality standards and even more difficult to prove that a particular operator's discharge reduced water quality below these standards. *See* S. Rep. No. 92-414 (1971); *see also Gaston Copper*, 204 F.3d at 151.

The CWA (and its later amendments) represented a fundamental change in the manner of federal regulation of water pollution. The CWA "shifted the focus away from water quality standards to direct limitations on the discharge of pollutants." *Gaston Copper*, 204 F.3d at 151 (citing 33 U.S.C. § 1311). Regulators no longer had to determine whether there was a causal link between the degradation of water quality and the pollutant in question; they simply had to determine whether the entity was discharging more pollutant into water than allowed by the CWA. *Id.* The CWA also established a default regime of strict liability. Unless a discharge fit within one of the CWA's limited exceptions, the entity discharging the pollutant violated the CWA, regardless of the quantity of pollutant emitted. *Id.* Thus, the "centerpiece of the Clean Water Act," § 301(a), provides that "[e]xcept as in compliance with this section and [other sections of the Act], the discharge of any pollutant by any person shall be unlawful." *Gaston Copper*, 204 F.3d at 151 (quoting 33 U.S.C. § 1311(a)).

The primary exception to the blanket liability imposed by the CWA is the NPDES permitting system. *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977) ("[T]he legislative history makes clear that Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [§] 301(a)."). Although Congress intended the CWA to lead to the long-term elimination of pollutants in the nation's waterways, Congress recognized the technological infeasibility of prohibiting all pollutants in the short term. *See id.* at 1373. Therefore, under § 402 of the CWA, individuals may apply for NPDES permits

to discharge a limited amount of effluent. *See* 33 U.S.C. § 1311(a), 1342(a) & (c). The EPA issues NPDES permits; however, the EPA suspends its issuance of permits if it approves a state permitting program. *See id.* § 1342(c)(1). The EPA has authorized approximately forty states, including Maryland, to issue NPDES permits. *See* 57 Fed. Reg. 43,733, 43,734-35 (1992) (listing states with permitting authority). Permit holders, no matter the issuing authority, are required to comply "not only with the limitations on the amount of pollutants they may discharge, but also with a variety of monitoring, testing, and reporting requirements." *Gaston Copper*, 204 F.3d at 151. Assuming that they follow the terms of their NPDES permits, however, permit holders avoid CWA liability.

In crafting a permit, the permitting authority (either the EPA or the designated state authority, in this case, the MDE), must take account of two central concepts. The CWA requires that "every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet 'water quality standards.'" *American Paper Inst., Inc. v. United States Envt'l. Prot. Agency*, 996 F.2d 346, 349 (D.C. Cir. 1993) (citing 33 U.S.C. § 1311(b)(1)) (internal citations omitted). Thus, despite the CWA's shift in focus of environmental regulation towards the discharge of pollutants, water quality standards still have an important role in the CWA regulatory scheme.[9] Before issuing a permit the permitting authority must, with reference to what is technologically feasible, incorporate "discharge limitations necessary to satisfy [the state water quality] standard." *Id.* at 350 (citing § 301 of the CWA).

The effectiveness of the permitting process is heavily dependent on permit holder compliance with the CWA's monitoring and reporting

---

[9]Under the CWA, states have the primary role in promulgating water quality standards. The CWA requires that states review their water quality standards at least once every three years in "a process commonly known as triennial review" to ensure that the standards "'protect the public health or welfare, enhance the quality of water and serve the purposes' of the Act." *American Paper Inst.*, 996 F.2d at 349 (quoting 33 U.S.C. § 1313(c)(2)(A)).

requirements. *See* 33 U.S.C. § 1318. The permitting authority receives discharge information from all relevant parties and then calibrates each individual permit to maintain overall state water quality standards. NPDES permits are therefore somewhat interdependent; the permitting authority must account for the effluent discharge of others in calculating the appropriate levels for an individual permit holder.

### B.

Having briefly reviewed the history and structure of the CWA, we now turn to the central question on appeal, the nature of the Commissioners' liability, if any, under the CWA. The district court concluded that the CWA prohibits the discharge of any pollutant not expressly allowed by an operator's NPDES permit. The Commissioners challenge that ruling, contending that the permit shield defense bars suit against NPDES permit holders under the CWA except for violations of the express conditions of the permit. We view each of these interpretations as being at variance with the CWA's liability scheme; although the CWA does prohibit the discharge of pollutants not contained within the NPDES permit, the protection offered by the permit is broader than the district court suggests.

At issue is the scope of the permit shield defense. As noted previously, the NPDES permit sets out the allowable departures from the CWA's baseline of total liability for discharges of effluent. *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d at 1374. It is clear, therefore, that if a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will "shield" its holder from CWA liability. The permit shield defense, however, raises two additional questions that are slightly more difficult: (1) what comprises the scope or terms of an NPDES permit, and (2) whether the permit shield bars CWA liability for discharges not expressly allowed by the permit when the holder has complied with the permit's express restrictions. It is to these matters that we now turn.

The central issue in determining the scope of a NPDES permit is whether the permit implicitly incorporates pollutant discharges disclosed by the permit holder to the permitting authority that are not explicitly allowed in the permit. Put more simply, although an operator may report multiple discharges of pollutants to the licensing body,

the permit may only contain explicit limitations for some of those pollutants. The question, in that circumstance, is whether the permit holder may continue to empty the unlisted pollutants into the water, or whether it may only discharge those pollutants that are specifically listed in the permit.

Determining the proper scope of an NPDES permit requires us to examine the language of the CWA. *See Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 358 (2d Cir. 1993). In construing the application of the CWA's provisions in this case, we find it necessary and appropriate to perform a *Chevron* analysis. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, we are required to apply a two-part test. First, we examine the language of the statute to see if "Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congressional intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If the statute is ambiguous, then we apply *Chevron*'s second step, and we defer to the agency's interpretation of its governing statute and regulations, as long as (1) the agency has promulgated that interpretation pursuant to a notice-and-comment rulemaking or a formal adjudication, *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), and (2) the agency's interpretation is reasonable. *Chevron*, 467 U.S. at 843. In analyzing the reasonableness of the EPA's interpretation of the CWA, "we need not find that [the EPA's interpretation] is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very 'complex statute' is a *sufficiently rational* one to preclude a court from substituting its judgment for that of EPA." *Chemical Mfrs. Ass'n. v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985) (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 75, 87 (1975)) (emphasis added).

In applying step one of *Chevron*, we view the crucial language of the CWA as ambiguous. The permit shield provision, 33 U.S.C. § 1342(k), specifies that "compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title." Although this statutory language makes clear that compliance with a permit constitutes an exception to the general strict

liability of the CWA, we must agree with the Second Circuit's conclusion that § 1342(k) does not explicitly explain the scope of permit protection. *See Atlantic States Legal Found.*, 12 F.3d at 357-58 (concluding that permit shield language ambiguous with respect to scope of coverage). Therefore, because Congressional intent is not clear, we must turn to the second step of the *Chevron* analysis.

In applying step two of *Chevron*, we observe that the EPA has promulgated, pursuant to a formal adjudication, an interpretation of the permit shield provision that is reasonable. The EPA is authorized both to administer and enforce the CWA. *See* 33 U.S.C. § 1251(d). In a 1998 formal adjudication proceeding before the EPA's Environmental Appeals Board,[10] *In re Ketchikan Pulp Co.*, the Board determined that the NPDES permit covers all pollutants disclosed to the permitting authority during the permit application process. 7 E.A.D. 605 (EPA 1998), 1998 WL 284964 (E.P.A.) at *12-13 ("[W]hen the permittee has made adequate disclosures during the application process regarding the nature of its discharges, unlisted pollutants may be considered to be within the scope of an NPDES permit, even though the permit does not expressly mention those pollutants."). In explaining this ruling, the *Ketchikan* Board observed that the EPA had already acknowledged that "it is impossible to identify and rationally limit every chemical or compound present in the discharge of pollutants" and that the EPA consequently had determined that the "goals of the CWA may be more effectively achieved by focusing on the chief pollutants and wastestreams established in effluent guidelines and disclosed by permittees in their permit applications." *Id.* at *11. The Board, adopting the reasoning of the Second Circuit in *Atlantic States Legal Foundation*, therefore held that "[t]he proper interpretation of the [CWA] regulations is that . . . [w]ater quality based limits are established where the permitting authority reasonably anticipates the discharge of pollutants by the permittee at levels that have the reasonable potential to cause or contribute to an excursion above any state water quality criterion." *Id.* at *11 (quoting *Atlantic States Legal Found.*, 12 F.3d at 358).

---

[10]The EPA Administrator has delegated authority to review NPDES permit violations to the Environmental Appeals Board. *See* 40 C.F.R. §§ 1.25, 124.2.

The *Ketchikan* decision therefore made clear that a permit holder is in compliance with the CWA even if it discharges pollutants that are not listed in its permit, as long as it only discharges pollutants that have been adequately disclosed to the permitting authority. *Id.* at *17 ("[T]he discharge of unlisted pollutants is in violation of the CWA unless the applicant makes adequate disclosures to permit authorities during the application process about the source and nature of its discharges."). To the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA. *Id.* at *13 ("[W]here the discharger has not adequately disclosed the nature of its discharges to permit authorities, and as a result thereof the permit authorities are unaware that unlisted pollutants are being discharged, the discharge of unlisted pollutants has been held to be outside the scope of the permit.").

The EPA in *Ketchikan* therefore outlined the proper structure for the permitting process. The applicant discloses the nature of its effluent discharges to the permitting authority. The permitting authority analyzes the environmental risk posed by the discharge, and places limits on those pollutants that, in the words of the Second Circuit and EPA, it "reasonably anticipates" could damage the environmental integrity of the affected waterway. *Id.* at *11; *Atlantic States Legal Found.*, 12 F.3d at 358 (internal citations omitted). Thus, as long as a permit holder complies with the CWA's reporting and disclosure requirements, it may discharge pollutants not expressly mentioned in the permit. *Ketchikan*, 1998 WL 284964 at *11. The only other limitation on the permit holder's ability to discharge such pollutants is that the discharges must be reasonably anticipated by, or within the reasonable contemplation of, the permitting authority. *Id.* at *11. Because the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority during the permit application process, whether spills or otherwise, do not come within the protection of the permit shield. We see the EPA's interpretation of the permit shield as a rational construction of the CWA's statutory ambiguity; as such, we deem it "reasonable" within the meaning of a *Chevron* analysis. *See Chemical Mfrs.*, 470 U.S. at 125. Therefore, because the CWA provision in question, § 1342(k), is ambiguous, and because the EPA's interpretation of this provision

is reasonable, we must defer under *Chevron* to the EPA's interpretation of the scope of an NPDES permit.[11]

Thus, the scope of the permit shield defense is relatively straightforward. An NPDES permit holder is shielded from CWA liability for discharges in compliance with its permit, and is liable for any discharges not in compliance with its permit. As the EPA has determined, however, compliance is a broader concept than merely obeying the express restrictions set forth on the face of the NPDES permit; all discharges adequately disclosed to the permitting authority are within the scope of the permit's protection. Having examined the nature of liability under the CWA, we turn to whether, in this case, the Plant's discharge of heat during the period in question was in violation of its NPDES permit and the CWA.

### C.

### 1.

The Commissioners would be in violation of their NPDES permit through the Plant's discharge of heat if either: (1) the permit specifically barred such discharges; or (2) the Commissioners did not adequately disclose them to the MDE. Section I of the Commissioners'

---

[11]Prior to its *Ketchikan* decision, the EPA in 1994 published a policy statement on the scope of the permit shield defense that mirrors its holding in *Ketchikan*. That statement provides in relevant part:

> A permit provides authorization and therefore a shield for the following pollutants resulting from facility processes, wastestreams and operations that have been clearly identified in the permit application process when discharged from specified outfalls:
>
> . . .
>
> 2) *Pollutants for which the permit authority has not established limits or other permit conditions, but which are specifically identified as present in facility discharges during the permit application process*[.]

Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES permits at 2-3 (July 1, 1994) (emphasis added).

NPDES permit expressly limits the discharge of certain pollutants, such as dissolved oxygen and fecal coliforms, but makes no mention of heat. Under the permitting process previously explained, that would indicate, assuming proper disclosure of its heat discharges, that the Commissioners did not violate the CWA. A footnote to the list of pollutants in the Commissioners' NPDES permit provides, however, that the "discharge of pollutants not shown shall be illegal." J.A. 1553. A plain application of this footnote, which is urged upon us by the Association, is that it is illegal for the Plant to discharge any pollutants not specifically listed in the permit at any level. Because heat is not listed in the NPDES permit, imparting this meaning to the footnote provision would render illegal the discharge of heated effluent by the Plant. The Commissioners, however, view the footnote as prohibiting only those pollutants that were not disclosed to the MDE during the permitting process. In other words, the Commissioners read the footnote as providing, "the discharge of pollutants not shown [to the MDE during the permitting process] shall be illegal."

In analyzing a provision of an NPDES permit, we review the district court's interpretation in the same manner as we would contracts or other legal documents. *See Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 512 (4th Cir. 1993) (applying rules of contract interpretation to benefit plan provision in ERISA lawsuit); *see also Northwest Envt'l. Advocates v. Portland*, 56 F.3d 979, 982 (9th Cir. 1995) (applying principles of contract interpretation to NPDES permit). We review the district court's application of contract principles de novo, but review its findings of fact with respect to extrinsic matters for clear error. *Hendricks*, 39 F.3d at 512.

A proper interpretation of the footnote requires that we first determine whether it is ambiguous; if "the language is plain and capable of legal construction, the language alone must determine" the permit's meaning. *FDIC v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir. 1995). If the footnote is ambiguous, however, then we must look to extrinsic evidence to determine the correct understanding of the permit. *See Northwest Envt'l. Advocates*, 56 F.3d at 983-984. Having carefully examined the footnote, we conclude that it is ambiguous. Although the footnote specifies that "the discharge of pollutants not shown shall be illegal," it fails to indicate either to whom or where the pollutants must be shown in order to fall within the NPDES per-

mit's protection. Both of the interpretations offered by the parties, i.e., (1) that the pollutants must be shown in the language of the permit, and (2) that the pollutants must be shown during the permit application process, are entirely reasonable readings of the footnote. Given this ambiguity, we must turn to extrinsic evidence to determine the intent of the permitting authority in drafting this footnote.

Examining the footnote in the context of the entire NPDES permit and the permitting process persuades us that the interpretation offered by the Commissioners is the correct one. Indeed, another section of the NPDES permit anticipates that the Plant will discharge new, unlisted pollutants. Pursuant to Section II.A.1 of the permit, titled "Change in Discharge":

> Any anticipated facility expansions, production increases, or process modifications which will result in new, different, or increased discharge of pollutants shall be reported by the permittee by submission of a new application at least 180 days prior to the commencement of the changed discharge or, if such changes will not violate the effluent limitations specified in this permit, by notice to the Department.

J.A. 1561. This subsection of the NPDES permit indicates that the MDE contemplated, in its issuance, that the Plant would in fact discharge pollutants other than those expressly listed. To suggest, therefore, that the footnote constitutes a blanket ban on all pollutants not listed in the NPDES permit is problematic. Indeed, the Second Circuit, in its *Atlantic States Legal Foundation* decision in 1993, interpreted a similar permit provision as inconsistent with a general prohibition on the discharge of new pollutants. *Atlantic States Legal Found.*, 12 F.3d at 359.

In fact, the structure laid out in the "Change in Discharge" provision reflects the permitting process as a whole. Because the focus of that process is to ensure that the MDE possesses sufficient information to calibrate discharge levels so that state water quality standards are met, the NPDES permit mandates that the Plant inform the MDE of future changes in what it discharges. This allows the MDE time to calculate the effects of the change and, if necessary, to modify the permit in order to maintain state water quality standards. If the permit

holder is discharging less of a pollutant than originally disclosed, however, the change in discharge poses no risk to the environmental integrity of the system. Therefore, it is no surprise that the "Change in Discharge" provision exempts such cases from the new application process.

Moreover, the logic of the Commissioners' position is apparent when the practical implications of interpreting the footnote as prohibiting the discharge of all pollutants not expressly listed, at any level, are considered. The CWA defines pollutant as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *See* 33 U.S.C. § 1362(6). This definition is extremely broad, covering innumerable individual substances. *See, e.g.*, *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 566 (5th Cir. 1996) ("[T]he definition of "pollutant" is meant to leave out very little . . . ."); *Atlantic States Legal Found.*, 12 F.3d at 357 (noting that there is "no principled reason why water itself, which is conceded to be a chemical, would not be considered a 'pollutant' under . . . the Act"). Thus, if we were to adopt the interpretation urged by the Association, the Plant would violate the terms of its NPDES permit (thereby giving rise to monetary and injunctive relief under the CWA) if it discharges an unlisted pollutant even at an infinitesimal amount.

We are not persuaded that the MDE either intended or contemplated such consequences when it issued the Commissioners' NPDES permit. The provision at issue, an eight-word footnote in a twenty-one page NPDES permit, deals with significantly less controversial topics in great detail. For example, the permit contains a half-page description of the MDE's and EPA's rights of entry. Further, the record contains no evidence that the MDE or any other party discussed this footnote, its provisions, its possible ramifications, or its proper interpretation during the permitting process. If the MDE had intended to impose liability on the Commissioners for the discharge of a fully disclosed but unlisted pollutant at any level, we would expect to find an extended discussion of the consequences of such a decision. Thus, having reviewed and carefully considered the extrinsic evidence concerning the MDE's intent in granting the Commissioners their permit,

we must conclude that the language of the permit itself contains no bar to the Plant's discharges of heat.[12]

2.

The final questions that we must address are whether the Commissioners adequately disclosed the Plant's discharges of heated effluent to the MDE during and after the permit application process, and whether the Plant's discharges of heat were reasonably contemplated by the MDE. If both of these conditions are satisfied, then the Commissioners are protected by the permit shield defense and they are not liable under the CWA.

The record clearly demonstrates that both of these conditions were in fact met. The MDE and the Commissioners each testified that the Commissioners informed the permitting authority that the Plant was discharging heat during the permit application process. *See* J.A. 1213-21, 1338-44. The record also contains a significant compilation of the daily reports on water temperature and heat discharges provided by the Commissioners to the MDE after the permit was issued in 1990; in addition, there is testimony from the MDE and the Commissioners that the Commissioners filed such reports as required by the permitting authority. The evidence thus demonstrates that the Commissioners complied with permit and CWA disclosure requirements. Furthermore, the testimony of the MDE and the Commissioners shows that the MDE reasonably contemplated that the Plant would discharge heat pursuant to its permit, and the temperature records demonstrate that the Plant did not act outside that reasonable contemplation. Therefore, the Commissioners are entitled to the full protection of the permit shield, and they are not liable under the CWA.

---

[12]Although adopting the Commissioners' interpretation of the footnote suggests that it simply represents the codification of the preexisting permit shield defense, it is important to recognize that the permit was issued in 1990, eight years before the EPA's decision in *Ketchikan*. When the permit was issued the scope of the permit shield defense was not clear, and therefore an effort by the MDE to shield all properly disclosed pollutants from CWA liability was not redundant.

## IV.

For the foregoing reasons, the judgment of the district court must be vacated, and we remand for the entry of judgment in favor of the Commissioners.

*VACATED AND REMANDED*