SOUTHERN NATURAL GAS COMPANY, et al., Plaintiffs-Appellees,

v.

PONTCHARTRAIN MATERIALS, INC., et al., Defendants-Appellees,

United States of America, Defendant-Appellant.

No. 82–3155.

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1983.

Rehearing and Rehearing En Banc Denied Nov. 16, 1983.

---

James A. Lewis, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Liskow & Lewis, Donald R. Abaunza, Thomas M. McNamara, Lafayette, La., for Southern.

Phelps, Dunbar, Marks, Claverie & Sims, James B. Kemp, Jr., C. Theodore Alpaugh, III, Antonio J. Rodriguez, Edward F. Le-Breton, III, New Orleans, La., for Pont. Dredging & Pont. Material.

Before THORNBERRY, GEE and WIL-LIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

I. *Introduction:*

The United States and the Army Corps of Engineers (the Corps)[1] appeal the judgment of the district court holding them liable for 40% of the damages incurred as a result of a dredge hitting a submarine gas pipeline.[2] Finding no error below, we affirm.

---

**1.** We will refer to both the Corps and the United States as the "Government" whenever appropriate. The district court found the Corps negligent on three separate issues, and the United States negligent on one issue, its failure to prepare adequate charts. Both the Corps and the United States were represented by the same counsel.

**2.** The district court found Pontchartrain Materials liable for 50% of the damages, and South-

## II. *Facts and Disposition Below:*

The events leading up to the accident are set out at length in the district court's opinion. *See Southern Natural Gas Co. v. Pontchartrain Materials, Inc.* (E.D.La.1981). We therefore need only set out a brief summary of these events here.[3]

Pursuant to its authority to regulate activities on navigable waters, the Corps over a period of several years issued SNG three permits to construct submarine gas pipelines. However, it only forwarded a copy of the first of these permits to the United States Coast Guard, which was responsible for preparing the official chart for the area. As a result, the Government chart showed only one pipeline in the area at the time of the accident. Moreover, this chart erroneously showed the location of that pipeline to be 585 feet east of its true location.

The Corps also issued dredging permits to four dredging companies operating on Lake Pontchartrain. These permits were extended from time to time. The extensions were granted subject to certain conditions set out in the extended permits. In their final form, the permits specifically prohibited dredging anywhere in the vicinity of the United Gas pipelines, within one mile of the Lake Pontchartrain causeway, directly under powerlines, or within one mile of the shorelines of Lakes Pontchartrain or Maurepas. The permits also contained general prohibitions against dredging in "any . . . area legally excluded by local and state laws and regulations," or interference with private rights. The permits made no specific mention of SNG's pipelines.

In January 1973, SNG became aware that dredging operations were being conducted in the vicinity of its pipelines, and advised the dredging companies to use due care in their operations. It also requested the Corps to include a specific prohibition against dredging in the vicinity of its pipelines in any permit extensions granted dredging companies. The Corps replied that the Louisiana Wildlife Commission (the Wildlife Commission), a state agency, prohibited dredging in that part of Lake Pontchartrain, and that "[d]redging in these areas is also prohibited by our permits."

Prior to granting the most recent extensions on the dredging permits, the Corps held a public hearing, and issued a Statement of Findings. In this Statement, the Corps acknowledged the concern expressed by the pipeline companies over the safety of their submarine pipelines.

The evidence shows that the Wildlife Commission prohibited dredging in the area solely to accommodate the competing interests of crabbers and sportsfishermen, and not out of any concern for public safety or for the integrity of submarine structures. The Commission thought that this responsibility lay with the Corps.

In late 1978 and early 1979, the Commission set out a zoning schedule permitting dredging in certain areas of the Lake previously off-limits to dredgers. SNG's pipelines were located in Zone 2 of the new dredging area. The Corps was never notified of this change. The zoning schedule was not drawn up pursuant to any specific laws or regulations, but was merely a compromise agreement reached to accommodate the needs of the various users of the Lake.

Charles Decker has been the Chief of the Regulatory Function Board and Operations Division of the Corps in the New Orleans District since 1970. Decker knew that SNG had three pipelines in the Lake, and testified that he was aware of his duties under existing federal regulations to consider the impact on existing structures before he issued a dredging permit. He stated, however, that the Corps did not specifically prohibit dredging near the SNG pipelines because it relied on the Wildlife Commission's prohibition against dredging in that area. He also testified that he had seen the letter sent by SNG requesting that the pipeline area be declared off limits to

ern Natural Gas Co. (SNG) liable for 10%. Neither of these parties appeals these findings.

3. The parties do not dispute the facts of this case.

dredgers, and that he himself authored the Corps' reply to that letter.

On April 4, 1979, the Captain of the dredge *Maurepas* went ashore on personal business, leaving leverman David Elliott in command of the vessel. Elliott had two years experience aboard the *Maurepas* and was considered "competent." The *Maurepas* was dredging in Zone 2 that day. After loading a barge, the *Maurepas* drifted east. Elliott ordered the dredge moved due west after he noticed an oil-well marker, and after ten minutes, satisfied that he was no longer near any oil well pipelines, resumed dredging. He immediately struck the middle SNG pipeline, rupturing it. Several men were burned. Damage to the pipeline amounted to $490,000, and the *Maurepas* was repaired at a cost of $40,000.

Following a bench trial, the district court found the Government liable in tort as follows:

1. The Corps failed to use due care in granting the dredgers an extension of their permit without modifying the permit to specifically restrict dredging activities over the Southern Natural Gas pipelines or to at least limit the depth of dredging to a permissible level.

2. The Corps improperly relied on the Louisiana Department of Wildlife and Fisheries to carry out the Corps' duties under its regulations to assure conformity with the provisions of the dredging permit, and failed to establish a structural system of coordination and communication with Wildlife and Fisheries with respect to protecting the pipelines.

3. The Corps was negligent in failing to inspect and monitor the activities of its permittees and in failing to ensure conformance with the provisions of the permit.

4. The United States was negligent in showing on Chart 11369 only one of the three Southern Natural Gas pipelines located in the Lake.

III. *Analysis:*

On appeal, the Government challenges each of the conclusions reached by the district court. Specifically, the Government contends that the regulations governing the issuance of permits did not impose upon it a duty to warn either the dredging company or the pipeline company of the attendant dangers. The Government contends that it was the duty of these companies to coordinate their activities in a manner that would prevent accidents of the type that occurred here. Alternatively, the Government argues that even if it owed a duty to the dredging and pipeline companies, it did not breach that duty. Finally, the Government contends that its alleged breach did not cause the accident.

A. *Duty:*

■ It is settled in our Circuit that the duty owed by the Government in claims brought under the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.* (1976), is equal "to that of a private person in like circumstances." *Canadian Pacific (Bermuda) Ltd. v. United States,* 534 F.2d 1165, 1168 (5th Cir. 1976). Under this standard, the Government must use due care in its undertakings. *Id.* See *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140, 149 (5th Cir. 1971).

The Corps derives its authority to issue permits like those issued here from the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.* (1976). Pursuant to this statute, the Department of the Army promulgated regulations governing the actions of the Corps. 33 C.F.R. § 320.4 sets out the general guidelines for evaluating permit applications: "The following policies *shall be* applicable to the review of all applications for Department of Army permits . . . (2)(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed . . . work may have on the . . . private uses to which the area is suited. (iv) The probable impact of each proposal in relation to the cumulative effect created by other *existing* and anticipated *structures* or work in the general area." (Emphasis added).

Section 325.2 governs the processing of applications. The Corps District Engineer first issues a public notice. § 325.2(a)(2). After considering all comments received in

response to this notice, subsection a(3), and preparing an Environmental Assessment or an Environmental Impact Statement where required, subsection a(4), "the District Engineer will determine ... whether or not the permit should be issued.... If a permit is warranted, the District Engineer *will determine the conditions* and durations which *should be incorporated into the permit.*" 33 C.F.R. § 325.2(a)(6) (emphasis added). Moreover, section 325.7 gives the Corps District Engineer the power to modify, suspend, or revoke its permits, "either on his own motion or as a result of periodic progress inspection."

> Among the factors to be considered are the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the activity authorized have changed since the permit was issued, extended or revalidated, and the continuing adequacy of the permit conditions; *any significant objections to the activity authorized by the permit* which were not earlier considered; revisions to applicable statutory and/or regulatory authorities; and the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the permittee has reasonably made or taken in reliance on the permit. Significant increases in scope of a permitted activity will be processed as new applications for permits in accordance with § 325.2, and not as modifications under this paragraph.

33 C.F.R. § 325.7 (emphasis added).

Finally, section 325.9 imposes a duty on the Corps District Engineer to inspect and monitor all authorized activities:

> **§ 325.9   Supervision and enforcement.**
>
> (a) *Inspection and monitoring.* District Engineers will assure that authorized activities are conducted and executed in conformance with approved plans and other conditions of the permits. Appropriate inspections should be made on timely occasions during performance of the activity and appropriate notices and instructions given permittees to insure that they do not depart from the approved plans. *Revaluation of permits to*

*assure compliance with its purposes and conditions will be carried out as provided in § 325.7.* If there are approved material departures from the authorized plans, the District Engineer will require the permittee to furnish corrected plans showing the activity as actually performed.

33 C.F.R. § 325.9(a) (emphasis added).

Together, these sections manifest the broad function performed by the Corps in regulating the activities of both public and private entities on navigable waters. The regulations provide a comprehensive system designed to ensure that the various activities and uses will neither interfere with nor endanger existing uses and structures. This is accomplished by providing a detailed procedure for the issuance of permits, followed by a flexible system allowing for modification of permits when subsequent inspection and monitoring disclose an activity which poses a threat to an existing use or structure.

■ The district court held, and we agree, that the Corps abused its discretion in granting extensions on the dredging permits without taking into account the real and potential danger to SNG's pipelines from the dredging activities.

■ On appeal, the Corps asserts that it was under no obligation to warn the dredging companies of the existence of the submarine gas pipelines. The Corps likens its permit-processing and granting procedures to those of a state agency in charge of issuing drivers' licenses to motor vehicle operators. The Corps argues that it is under no duty to warn navigators operating under a Corps permit of hazards in a lake, just as the state has no duty to inform drivers of hazards on the public roads.

We think that this simplistic analogy runs counter to both the letter and the spirit of the regulations under which the Corps must operate. The regulations governing the issuance of permits impose a duty on the Corps District Engineer that far surpasses the duty of the state agency responsible for the issuance of drivers' licenses. We know of no state regulation that invites public comment or requires the preparation of an

Environmental Assessment prior to the issuance of a driver's license. As stressed above, the regulations under which the Corps must operate call for a careful examination and balancing of the effect any activity conducted under a permit might have on "public and private uses to which the area is suited," or "on existing structures or work in the area." 33 C.F.R. § 320.4(a)(iii), (iv). When necessary, the regulations provide that the permits contain *conditions* that will ensure that the permittee will not in fact interfere with existing uses or structures.

Finally, by specifically prohibiting dredging activities in the vicinity of one gas company's pipelines, the Corps was obligated to prohibit dredging near other companies' pipelines in the area. *See Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955).

The duty created by these regulations runs *at least* to the owners of structures and other users and their employees in the area operating under permits.[4] The Corps is in the unique position of possessing all information relevant to all structures and uses in a particular body of water within its jurisdiction. Through its authority to issue permits, it can regulate the activities of its permittees to ensure that no personal or property losses occur. We do not agree with the Corps that our decision would require it to police the activities of all users of Lake Pontchartrain. These users have an independent duty to exercise due care in all of their activities. A simple notice or warning of a particular hazard or activity, or the prohibition of a certain activity, will ordinarily satisfy the duty owed by the Corps to its permittees.

We analogize this duty to warn to the common law duty owed a licensee by a private landowner.[5] It is well established that "the possessor of land [is] under an obligation to disclose to the licensee any concealed dangerous conditions of the premises of which he had knowledge." W. Prosser, Law of Torts § 60, at 381 (4th ed. 1971). *See also* 2 Restatement (Second) of Torts § 342 (1965).

The Corps knew that the dredging companies' activities would be incompatible with the submarine gas pipelines, and that a great potential for an accident existed. The Corps had the power to prevent this danger. Its failure to do so subjects it to liability under the Suits in Admiralty Act.[6]

Finally, the district court held that the United States was under a duty to indicate the location of the SNG pipelines on maps and navigational charts used by the dredging companies. The court held that although "[t]here are no regulatory or statutory requirements to provide copies of buried pipeline permits for state owned water bottoms ... to the National Oceanographic and Atmospheric Administration

---

**4.** We do not decide whether this duty also runs to members of the general public injured as a result of the Corps' breach of its duties under the regulations applicable here.

**5.** We recognize that the State of Louisiana owns the lake and its resources. However, the actions taken by the Corps in granting permits to users of the lake are much like those of a landowner issuing licenses to users of his land.

**6.** The Corps relies on a series of cases arising under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* holding that the Corps has no duty of care to employees of contractors arising from Corps safety regulations incorporated into its construction and service contracts. *See e.g., LeSuer v. United States,* 617 F.2d 1197 (5th Cir.1980). The holdings of these cases, however, do not apply here. They are based on the general principle that "the employer shall not be answerable for an injury resulting from the manner in which the details of the work are carried out by the independent contractor." *Market Insurance Co. v. United States,* 415 F.2d 459, 462 (5th Cir.1969) (quoting 27 Am. Jur. § 22, at 505). As we explained in *LeSuer,* "there is no Congressional authorization for the Corps to create a duty of care to business invitees leading to liability under the Federal Tort Claims Act." 617 F.2d at 1199. In our case, on the other hand, the regulations impose a duty on the Corps to carefully evaluate competing interests in its permit-granting process, and to prohibit certain activities when incompatible with existing uses or structures. Moreover, the Corps is under a duty to inspect and monitor the operations of its permittees, and to modify their permits when necessary. These regulatory duties place the Corps in its permit-granting and monitoring process in a position far different from the position it occupies in dealing with independent contractors and their employees.

for charting purposes . . . once the United States . . . undertook to make a chart with a buried pipeline, it became subject to liability for its failure to use reasonable care in making the chart if harm is suffered because of another's reliance on the chart" (citing *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)).

Our analysis affirming the result reached below travels a different path.[7] 33 C.F.R. § 209.310 provides:

### § 209.310 Representation of submarine cables and pipelines on Government charts.

The policy of the Corps of Engineers with respect to showing the locations of submarine cables and pipelines on charts published by the Government is as follows:

(a) Within protected waters such as harbors, rivers, bays, estuaries, or other inland waterways, the location of submarine pipelines and cables is to be indicated by shaded areas marked "Pipeline area" or "Cable area" on Government charts issued for general use. The extent of the limits of the area will be governed by local conditions but shall include in all cases the immediate area which overlie the cable or pipeline.

. . . . .

(c) Whenever a change is made in the position of any submarine cable or pipeline shown by shaded area on Government charts, or a new cable or pipeline is laid beneath navigable waters at a depth where interference with navigation or fouling by anchors is probable, the District Engineer will indicate the changed or new location of a copy of the Coast and Geodetic Survey Chart of the locality or on a reproduction made from such chart. The District Engineer will furnish three copies of the chart showing the cable or pipeline location by a shaded area to the Chief of Engineers with his recommendation concerning the designation thereof on Government charts. Ordinarily the shaded area should not exceed more than 500 feet on each side of the location of the pipeline or cable except on the very small scale charts where an area of that width would not be of sufficient prominence. The shaded area will be designated "Cable area" or "Pipeline area", as the case may be, but no other information as to the character or ownership of the installation will appear on the chart.

(d) Cables and pipelines laid at sufficient depths below the beds of waterways to prevent interference with navigation or fouling by anchors are not required to be shown on Government charts and report thereon is not necessary.

Section 209.310 clearly imposes a duty on the Government to indicate the locations of submarine pipelines and cables on government charts. The evidence shows that the SNG pipelines were buried three feet below the mudline, and that dredges such as the *Maurepas* are capable of dredging for shells up to six feet below the mudline. Decker testified that he believed that dredgers sometimes dredged three feet below the mudline. It is clear, therefore, that the safety clause in section 209.310(d) does not apply, and that the Government was under a duty to show the locations of the three SNG pipelines on its charts.[8]

### B. *Breach:*

The Government contends that it fulfilled its duty to warn and inspect by including in the permit provisions prohibiting violations of state laws and regulations,

7. We may, of course, affirm the district court's decision on any ground urged below, regardless of whether it was relied on by the district court. *Bickford v. Int'l Speedway Corp.,* 654 F.2d 1028, 1031 (5th Cir.1981).

8. Although we need not reach this issue, we note that even in the absence of the duties imposed on the Government by section 209.-310, the principle of reliance established by the Supreme Court in *Indian Towing, supra,* would have imposed a continuing duty on the Government to use due care to make certain that the charts accurately showed the location of the SNG pipelines once it took it upon itself to indicate the position of one of the pipelines on the charts. *See* 76 S.Ct. at 126–27. *See also De Bardeleben,* 451 F.2d at 148–49 (Government must use due care in preparation and dissemination of charts and notices correcting errors and announcing changes in old charts).

as well as invasions of private rights. Specifically, the Corps argues that state laws or regulations prohibited dredging in Zone 2 of the Lake at the time the permit extensions were considered, and that it relied on the State Wildlife Commission to continue its policy restricting dredging in that area. The evidence shows that an informal agreement, though not a regulation, existed whereby the Wildlife Commission prohibited dredging in Zone 2 in order to protect the interests of crabbers and sportsfishermen. That prohibition against dredging was lifted in early 1979 by the Commission. The Corps, however, was not notified of this change.

We know of no regulation allowing the Corps to delegate its duties to a state agency such as the Wildlife Commission, and the Corps has cited none. Section 325.9(b) provides that "[t]he assistance of . . . personnel of other interested . . . State . . . agencies to observe and report [permitted] activities will be encouraged." We read this section merely as encouraging a sensible system of coordination where activities of state and federal agencies overlap. The Corps' reliance on the Wildlife Commission's prohibition against dredging constituted a failure to follow its own regulations.

The district court held that the Corps "took no action to establish a system of coordination and communication with the [Wildlife] Commission with respect to protecting the pipelines, yet relied on the state agency to carry out the Corps' duties, under its regulations, to assure conformity with the provisions of the permit." We agree. Such a system of coordination is implicit in section 325.9(b), *supra.* We do not read the district court's holding as requiring the Corps to establish a structural system of communication with state agencies in every case. However, where the Corps asserts that it relied on a state agency to fulfill one aspect of its regulatory function, we hold that at a minimum, a system of coordination must be established to ensure that federal requirements are met. The Corps' failure to do so in this case constituted a breach of its duty to monitor and inspect as well as

prohibit incompatible activities by its permittees.

The Corps next argues that the provision in the permit prohibiting invasions of private rights amounted to a Corps' prohibition against conducting dredging operations near the SNG pipelines. However, the evidence shows that the Corps failed to inform the dredging companies that this passage referred to SNG's right-of-way. We reject the Corps' argument that it would be impractical to provide a complete list of all private rights-of-way to its permittees. Our holding does not impose such a requirement. However, where an activity by one party endangers or interferes with an existing use or structure, the Corps is under a continuing duty to warn the agent, or prohibit the activity. We agree with the district court that the prohibitions in the permit referring to interference with private rights and violations of state laws and regulations are general and vague, and fail to put permittees on notice of those activities which may prove unsafe.

The United States next argues that by including a cautionary statement on the chart, it satisfied its obligation to show the location of all pipelines. The statement appearing on the chart reads as follows:

CAUTION

SUBMERGED PIPELINES AND CABLES

A selection of the large submerged pipelines are shown thus:

. . . .

Uncharted submerged pipelines and cables may exist in the vicinity of oil well structures, and between such structures and the shoreline. Mariners should use caution when anchoring, dragging or trawling.

We agree with the dredging company and SNG that this language refers only to submerged pipelines beneath oil well structures, and does not caution navigators of the existence of submarine gas pipelines, such as SNG's, that are not normally found in the vicinity of oil well structures.[9]

---

9. The Corps also argues that it need not have

monitored the dredgers' activities because that

## C. *Causation:*

The Government next argues that even if it breached some duty, this breach was not the cause of the accident. Rather, it contends that the negligence of the dredging company and its operators was the sole contributing cause of the accident. We reject this argument as well.

Causation in fact is defined as follows: "[A] defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about." W. Prosser, *supra,* § 41 at 240. Most courts also use the more traditional "but for" test in determining causation. Such a determination is a finding of fact, and will not be set aside unless clearly erroneous. Fed.R. Civ.Pro. 52(a).

█ The Government first argues that its failure to include specific restrictions in the original or extended dredging permits did not cause the accident because the dredgers were on actual or constructive notice of the existence of SNG's pipelines. The evidence shows that the dredge owners and operators indeed knew of the existence of a pipeline in Zone 2 of the Lake. This knowledge, however, merely establishes their liability to SNG. A specific restriction in the dredging permit prohibiting dredging in the vicinity of the SNG pipelines would have established a safety zone in the area, and could well have prevented the accident from occurring. Similarly, had the Corps moved to prohibit dredging near the pipelines after it was notified by SNG that dredging activities were being conducted dangerously close to their pipelines, the accident might well have been prevented. Finally, the failure by Elliott to consult the chart prior to the accident was not the sole cause of the accident. The record shows that the chart was negligently prepared in at least two respects. First, it showed only the 20″ pipeline, whereas in fact, three pipelines existed. Second, the chart erroneously showed the location of the 20″ pipe-

line 585 feet *east* of its true location. Since the 24″ pipeline was constructed 500 feet west of the 20″ pipeline, it is clear that the location of the 24″ pipeline was 1085 feet west of the location of the pipeline shown on the chart. We agree with the district court that had the dredge operators known the actual locations of the three pipelines, or even the correct location of the only pipeline shown on the chart, they would have used greater caution when operating in the area, and could have avoided the accident. Since our review of the record does not leave us with the firm conviction that an error was made, we affirm the district court's conclusion that the negligence of the Government was a cause in fact of the accident.

"The allocation of fault in maritime collision cases by a trial court . . . is a question of fact. . . . Liability . . . 'is to be allocated among the parties proportionately to the comparative fault,' not according to their degree of causation." *Gele v. Wilson,* 616 F.2d 146, 147–48 (5th Cir.1980) (quoting *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975)). In light of the Government's unexcused dereliction of its express regulatory duties, we cannot say that the trial court's allocation of fault in this case was clearly erroneous. Accordingly, having rejected all of the Government's challenges on this appeal, we affirm the judgment of the district court.

---

function is already performed by the Bureau of Mines. We reject this argument. The Government does not cite any regulation, nor have we found one, outlining the nature of the dredge inspection performed by the Bureau of Mines. Moreover, even accepting the Government's as-

sertion that the Bureau inspects the *dredges,* it is still the duty of the Corps under the applicable regulations to inspect the activities of dredgers to ensure that no interference with an existing use or structure occurs.