# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-20265

United States Court of Appeals
Fifth Circuit

**FILED**

May 28, 2015

Lyle W. Cayce
Clerk

CONTANGO OPERATORS, INCORPORATED;
CERTAIN UNDERWRITERS SEVERALLY SUBSCRIBING TO
COMBINED COVER NOTE JHB-CJP-1718,

Plaintiffs–Appellees,

versus

WEEKS MARINE, INCORPORATED; UNITED STATES OF AMERICA,

Defendants–Appellants.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-532

Before SMITH, PRADO, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

Weeks Marine, Inc. ("Weeks"), and the United States appeal a judgment holding them 40% and 60% liable, respectively, for damages Contango Operators, Inc. ("Contango"), suffered in a dredging accident. Weeks claims that it

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20265

was not negligent as a matter of law and, alternatively, that it is only 10% liable. The government urges that an exculpatory clause in Contango's pipeline permit precludes holding it liable. We affirm.

I.

In November 2007, Contango obtained a permit from the Army Corps of Engineers (the "Corps") to build a submarine pipeline in the Gulf of Mexico off the coast of Louisiana. Although the application indicated that the pipeline would cross the Corps-maintained Atchafalaya Channel, the Corps's Regulatory Division, which approved the pipeline, mistakenly did not forward that information to the Waterways Division, which provides those details to the engineers who prepare dredging contracts for Corps-maintained channels. In April 2008, Contango finished construction and submitted as-built drawings showing the pipeline's placement to other government agencies, including the Minerals Management Service ("MMS") and the Coast Guard, but not to the Corps.

In August 2009, the Corps awarded Weeks a contract to dredge the channel. The project specifications identified five submarine pipelines in or near the channel, but they omitted the Contango pipeline. At the time, National Oceanic and Atmospheric Administration ("NOAA") charts also did not include the pipeline. That November and December, however, NOAA published updated versions of the two relevant charts on its website based on information it received from MMS; in December, the Coast Guard announced the addition of the pipeline in a local notice to mariners. Nevertheless, Weeks relied entirely on the specifications to locate pipelines and did not consult other materials for that purpose.

No. 14-20265

In February 2010, Weeks's dredging barge, the G.D. MORGAN, struck the pipeline, rupturing it and causing losses. Contango and its underwriters sued Weeks and the United States, alleging negligence under general maritime law. After a bench trial, the court held Weeks liable for 40% of the damages and the United States liable for 60%.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*."[1] Foreseeability, breach of a duty, and allocation of fault are questions of fact,[2] while interpretation of a permit is a question of law.[3]

## III.

Contango asserts that we lack jurisdiction to consider the issues Weeks raises. Contango's theory is that the district court dismissed Weeks's indemnification crossclaims against the government for lack of jurisdiction and that Weeks has not appealed that dismissal but is nevertheless attempting to maintain the same claims. But Weeks is not seeking indemnification from the government on appeal; instead, it is merely saying it is not liable to Contango. A ruling that the government is liable and Weeks is not would have the effect of requiring the government to pay for the entire amount of the damages, but

---

[1] *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009) (quoting *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)).

[2] *E.g.*, *United States v. Rodriguez*, 553 F.3d 380, 395 (5th Cir. 2008) (foreseeability); *Theriot v. United States*, 245 F.3d 388, 400 (5th Cir. 1998) (per curiam) (breach of duty); *Henderson v. Norfolk S. Corp.*, 55 F.3d 1066, 1069 & n.6 (5th Cir. 1995) (allocation of fault).

[3] *See, e.g.*, *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 269 (4th Cir. 2001); *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 982 (9th Cir. 1995).

No. 14-20265

that would not be indemnification,[4] so we have jurisdiction.

IV.

Weeks challenges the district court's ruling that it is liable because it breached its duty of reasonable care by relying solely on the specifications to determine pipeline locations.[5] The court recognized that it was common practice in the dredging industry to use only the specifications, but it noted that Weeks easily could have downloaded updated NOAA charts and used local notices to mariners to check for new pipelines. It explained that Weeks should have taken those precautions given the minimal burden of doing so and the risk of causing significant damage by striking a pipeline. We agree.

"'[N]egligence is an actionable wrong under general maritime law,' and the elements of that tort are 'essentially the same as land-based negligence under the common law.'"[6] "To state a claim for relief . . . the 'plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"[7] "[T]he appropri-

---

[4] *See* RESTATEMENT (SECOND) OF TORTS § 886A cmt. l (1979) ("Indemnity . . . shifts the entire loss from one tortfeasor to another.").

[5] Alternatively, the court held Weeks liable under the rule from *THE LOUISIANA*, 70 U.S. (3 Wall.) 164 (1865). We do not reach that issue.

[6] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (alteration in original) (quoting *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 842 (5th Cir. 2005)).

[7] *Id.* at 211 (alteration in original) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

ate standard of care in an allision case is reasonable care under the circumstances."[8]  That duty is "owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct."[9]  "[W]e have considered harm to be a foreseeable consequence of an act or omission 'if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.'"[10]

Weeks contends that, under *Michigan Wisconsin Pipeline Co. v. Williams-McWilliams Co.*, 551 F.2d 945 (5th Cir. 1977), the district court's factual findings mandate the conclusion that Weeks was not negligent.  In its view, that case established that a Corps dredging contractor that justifiably relies on specifications provided by the Corps is not liable for damages that result.  Weeks says that rule applies because the district court found that the Corps had omitted the Contango pipeline from the specifications, the custom of the dredging industry was to rely solely on the specifications, and no regulation required the crew of the G.D. MORGAN to carry updated NOAA charts or to review local notices to mariners.

Weeks misreads *Michigan Wisconsin.*  There, a Corps dredging contractor struck a pipeline that had been constructed pursuant to a Corps permit.  *Id.* at 946–47.  The specifications had omitted the pipeline.  *Id.* at 948.  The

---

[8] *Theriot*, 245 F.3d at 400; *accord Fischer v. S/Y NERAIDA*, 508 F.3d 586, 594–95 (11th Cir. 2007) (collecting cases applying reasonable-care standard).  "An allision is a collision between a moving vessel and a stationary object."  2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 14-2 n.1 (5th ed. 2014).

[9] *Great Lakes*, 624 F.3d at 211 (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)).

[10] *Id.* (quoting *Consol. Aluminum*, 833 F.2d at 68).

pipeline owner sued the dredger, alleging negligence under general maritime law, and the dredger impleaded the government. *Id.* at 949–50. The district court held the dredger liable but dismissed the third-party complaint against the government. *Id.* at 950. We affirmed the judgment for the pipeline owner, agreeing with the district court that it was faultless. *Id.* at 947, 953. As for the third-party complaint, we announced a rule that, "if the [Corps] made a representation to [the dredger] on which the latter was justified in relying, and if that representation was the proximate cause of the injury to [the pipeline owner], then the Government must bear the liability." *Id.* at 951. We found those requirements satisfied because the Corps's omission of the pipeline from the specifications was a positive assertion of its absence and the dredger had justifiably relied on that representation, because it was not required to investigate the existence of pipelines independently. *Id.* at 951–53. Accordingly, we reversed the dismissal of the third-party complaint. *Id.* at 954.

The rule in *Michigan Wisconsin* governs a dredger's claim against the government, not a third party's claim against a dredger. If Weeks were maintaining a cross-claim against the government, the government would be liable if the specifications were a representation on which Weeks was justified in relying, and the specifications were a proximate cause of Contango's injury. But we have no occasion to consider that question, because the only claims before us are Contango's claims against Weeks and the government. *Michigan Wisconsin* is inapplicable.

Weeks's only other argument is that a mistake in the specifications was unforeseeable. The district court's implicit finding that Weeks could have anticipated an error was not clearly erroneous, particularly given that there have

been other cases involving accidents caused by similar omissions.[11] Therefore, the court properly held Weeks liable because it breached its duty of reasonable care.

## V.

The only issue the United States raises on appeal is whether the exculpatory clause bars recovery. The provision states in relevant part:

> *Limits of Federal Liability.* In issuing this permit, the Federal Government does not assume any liability for the following:
>
> . . . .
>
> b. Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.

The government submits that the clause applies because the Corps's dredging project was an "activit[y] undertaken by or on behalf of the United States in the public interest." We conclude that the clause does not shield the government from liability in this case.

We interpret a permit in the same manner as we would a contract or other legal document. *E.g.*, *Piney Run*, 268 F.3d at 269. "[W]e first determine whether it is ambiguous; if 'the language is plain and capable of legal construction, the language alone must determine' the permit's meaning." *Id.* at 269–70 (quoting *FDIC v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir. 1995)). "If [it] is ambiguous, however, then we must look to extrinsic evidence to determine the correct understanding of the permit." *Id.* at 270.

---

[11] *See S. Natural Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1253–54 (5th Cir. 1983) (omission from Coast Guard chart and Corps permits for private dredging projects); *Michigan Wisconsin*, 551 F.2d at 947–49 (omission from specifications for Corps dredging contract).

No. 14-20265

The language is clear. The introductory phrase "*In issuing this permit*, the Federal Government does not *assume* any liability" (emphasis added) refers only to taking on new liability. Accordingly, the clause means that the permit or its issuance does not provide a basis for liability for the types of damages listed; it does not suggest the government is protected from existing sources of liability independent of the permit.[12]

The government asks us to consider other evidence despite the disclaimer's plain language. It says that, in 1986, the introductory phrase was changed from "the United States shall in no case be liable" to "the Federal Government does not assume any liability" but that a comment published in the Federal Register clarified that the change was not intended to narrow the clause's scope.[13] Separately, the government points to a regulation requiring the Corps

---

[12] The Court of Federal Claims adopted the same interpretation of identical permit language. *See Banks v. United States*, 69 Fed. Cl. 206, 217 (2006) ("The limitation of the government's liability in '[i]ssuing [a Section 10] permit' on which [the government] relies is the statement that 'the Federal Government does not assume any liability for the . . . [d]amages . . . caused by the activity authorized by this permit.' But it is not legally relevant here whether [the government] 'assume[s]' liability or not. Under [*United States v. Dickinson*, 331 U.S. 745 (1947)], [the government] is liable for all that has been taken as a result of its activities; there is no liability for the government to 'assume.' Nothing in the Permit Form operates to remove the liability." (first, second, fourth, and sixth alterations in original) (citation omitted)).

[13] Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206, 41,213 (Nov. 13, 1986) (codified at 33 C.F.R. pt. 325, app. A) ("Limits of Federal Liability: One commenter suggested that the Government could, under certain circumstances, be held liable for damages caused by activities authorized by the permit and suggested that Item 3, which limits the Government's liability, be deleted in its entirety. While it is true that some courts have found the United States liable for damages sustained by the owners of permitted structures or by individuals injured in some way by those structures, it has never been the intent of the Corps to assume either type of liability or to insure that no interference or damage to a permitted structure will occur after it has been built. In permitting structures within navigable waters, the Corps does not assume any duty to guarantee the safety of that structure from damages caused by the permittee's work or by other authorized activities in the water, such as channel maintenance dredging. This is viewed as an acceptable limitation on the privilege of constructing a private structure for private benefit in a public waterway,

to inform permit applicants "that the United States will in no case be liable for any damage or injury to the structures or work authorized . . . which may be caused by, or result from, future operations undertaken by the Government for the conservation or improvement of navigation or for other purposes." 33 C.F.R. § 320.4(g)(4).

We decline the government's invitation to review those materials. The government offers several reasons we should do so despite the permit's clear language, but none is convincing.

To begin with, the government suggests the clause's history and regulatory background are not extrinsic. They are. The legal definition of "extrinsic" is "From outside sources; of, relating to, or involving outside matters,"[14] and a body of contracts caselaw establishes that "extrinsic evidence" is anything outside a contract itself.[15] The evidence the government asks us to examine falls squarely within that definition because it appears in the Federal Register and the Code of Federal Regulations, not in the permit itself.

Next, the government claims that we should interpret a regulation in light of the regulations surrounding it and should defer to an agency's reasonable interpretation of its own regulation where it is ambiguous. That may be

---

particularly since insurance is readily available to protect the permittee from any damage his structure may sustain. Accordingly, the language in Item 3 has been further clarified to preclude any inference that the Government assumes any liability for interference with or damage to a permitted structure as a result of work undertaken by or on behalf of the United States in the public interest.").

[14] BLACK'S LAW DICTIONARY 706 (10th ed. 2014).

[15] *See, e.g.*, *Wal-Mart Stores, Inc. v. Qore, Inc.*, 647 F.3d 237, 243 (5th Cir. 2011) (under Mississippi contract law, "extrinsic evidence" is anything outside "the four corners of the document"); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (same under Texas law); *Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410, 439 (5th Cir. 2002) (same under Louisiana law).

true, but those rules are inapplicable because we are interpreting a permit, not a regulation.

In addition, the United States urges that, under the parol evidence rule, we may look to extrinsic evidence to prove a meaning to which the provision is reasonable susceptible. Even assuming that principle applies, it does not help the government, because the clause is not reasonably susceptible to the government's proposed meaning. *See supra* note 12 and accompanying text.

Finally, the government says there is "no authority to support the proposition that an agency's explanatory comments and regulations can be ignored as 'extrinsic evidence.' These are not merely additional documents that may inform a party's intent in entering a contract; they are law promulgated by an agency . . . ." The government misunderstands the role of the permit in this litigation. The Corps has a duty of reasonable care under general maritime law,[16] and Congress waived sovereign immunity in cases alleging breaches of that duty.[17] The Corps has no power to escape that duty through regulation; instead, the question is whether Contango gave up its right to sue by accepting the permit's terms. Consequently, we decline to consider the government's extrinsic evidence and conclude that the clause means that the permit or its issuance does not provide a basis for liability for the types of damages listed.[18]

---

[16] *See Theriot*, 245 F.3d at 400 ("[T]he appropriate standard of care in an allision case is reasonable care under the circumstances."); *S. Natural Gas*, 711 F.2d at 1254 ("It is settled in our Circuit that the duty owed by the Government in claims brought under the Suits in Admiralty Act is equal 'to that of a private person in like circumstances.'" (citation omitted) (quoting *Canadian Pac. (Berm.) Ltd. v. United States*, 534 F.2d 1165, 1168 (5th Cir. 1976))).

[17] *See* 46 U.S.C. § 30903(a).

[18] The government postulates that there is no situation in which the clause would apply under this interpretation. That is incorrect. For example, the Corps might issue a

No. 14-20265

By this reading, the clause does not apply here. The Corps's liability was based on its duty of reasonable care under general maritime law, just as Weeks's was. The district court held the Corps liable because it had failed to exercise that level of care, as it did not include the Contango pipeline in the specifications or notify Weeks of the omission. Thus, liability was not based on the permit or its issuance.

The government responds that the duty of reasonable care extends only to interests foreseeably jeopardized by the negligent conduct and that the Corps could foresee harm to the Contango pipeline only because of the information Contango provided in its permit application. In the view of the United States, that means the Corps's duty to Contango arose out of the permit or its issuance, so the disclaimer applies. The government is correct that foreseeability is required, but the tortfeasor need only be able to foresee jeopardy to the "general class" of interests at issue.[19] The district court found that "[a]n allision with a submarine pipeline is a foreseeable consequence of dredging when the dredger is not aware of the pipeline." That finding establishes that the Corps could have foreseen jeopardy to the general class of interests in question—submarine pipelines—so it had a duty to use reasonable care to avoid harming those interests, a duty that was not based on the permit or its issuance.

---

pipeline permit and then build a dam that makes it difficult to access the pipeline for maintenance and repairs. The provision would apply if the pipeline owner sued, alleging that the Corps had implicitly guaranteed continued access to the pipeline.

[19] *Great Lakes*, 624 F.3d at 211 ("In the context of maritime torts, we have considered harm to be a foreseeable consequence of an act or omission 'if harm *of a general sort to persons of a general class* might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.'" (emphasis added) (quoting *Consol. Aluminum*, 833 F.2d at 68)).

No. 14-20265

The government's reliance on *Southern Natural Gas*, 711 F.2d 1251, for the proposition that the Corps's duty was based on permitting regulations is also misplaced.  There, a dredger struck a submarine pipeline while working on a private project authorized by a Corps permit.  *Id.* at 1253–54.  Based on permitting regulations, we determined that the Corps's duty of reasonable care in that situation required it to warn permittees of hazards.  *Id.* at 1154–56.  We held the government liable for part of the damages because the Corps had failed to do so.  *Id.* at 1157–59.

But the fact that permitting regulations defined the Corps's duty of reasonable care in that case does not mean they did so here.  What constitutes reasonable care depends on "(1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules . . . ; and (3) recognized customs and usages."[20]  In *Southern Natural Gas*, the Corps's role was limited: It was merely permitting private dredging projects.  Nevertheless, permitting regulations meant that its duty of reasonable care encompassed a duty to warn. Here, the Corps's role was larger:  It was conducting its own dredging project and hiring a contractor to dredge a specific area.  Because of its greater role in this situation, we conclude that "general concepts of . . . reasonable care" imposed on the Corps an obligation to inform Weeks about submarine pipelines in the area.[21]  In other words, the government's duty of reasonable care

---

[20] *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 606 (5th Cir. 2010) (omission in original) (quoting *Fischer*, 508 F.3d at 594).

[21] *Cf., e.g., Theriot*, 245 F.3d at 393–95 (stating that district court did not clearly err in finding that Corps was negligent in failing to place warning sign at location of underwater sill it had constructed, even though no regulation required it to do so); *Sheridan Transp. Co. v. United States*, 834 F.2d 467, 474 (5th Cir. 1987) (holding that Coast Guard was not required to mark wreck, but once it chose to do so, it had duty to use due care).

included a duty to warn Weeks of potential dangers, but that is not because of permitting regulations.[22]

Nor was the Corps's breach predicated only on its failure to consult the information from Contango's permit application when it prepared the specifications. The Corps represented to Weeks that there were no other pipelines in the area, and it knew that Weeks would rely entirely on the specifications. If the Corps could not be sure the specifications were accurate, it should have warned Weeks of that limitation or required Weeks to inspect the site,[23] but it did neither.[24]

Further, the district court found that the Corps was negligent not only in preparing the specifications but also "in failing to warn or notify Weeks Marine of the existence of the Contango Pipeline before Weeks Marine's barge struck the pipeline." The Corps awarded the contract in August 2009, and Weeks struck the pipeline in February 2010. Updated NOAA charts and a local notice to mariners became available in the intervening months, but the Corps neither consulted them nor required Weeks to do so. As a result, the government's liability was independent of the permit and its issuance, so the

---

[22] Any suggestion by the district court that the Corps had duties based on its role in the permitting process does not change our conclusion, because we may affirm for any reason supported by the record. *LLEH, Inc. v. Wichita Cnty., Tex.*, 289 F.3d 358, 364 (5th Cir. 2002).

[23] The Corps has done precisely that in the past. *See Michigan Wisconsin*, 551 F.2d at 949 (in which contract required dredger to "take[] steps reasonably necessary to ascertain the nature and location of the work and the general and local conditions which can affect the work" and to "investigate[] and satisf[y] himself as to the conditions affecting the work").

[24] The provision of the contract that came closest to warning Weeks of the risk of unidentified pipelines was insufficient to satisfy the Corps's duty, given its awareness of Weeks's reliance: "Any unidentified pipelines, structures, or utilities that may be found within the limits of the work, during the course of dredging shall not be disturbed nor shall excavation be performed at this location unless approved by the Contracting Officer."

No. 14-20265

exculpatory clause does not apply.

## VI.

Although Weeks claims that it is liable for only 10% of the damages, we accept the district court's finding that Weeks is 40% liable.  Under general maritime law, joint tortfeasors are jointly and severally liable for the plaintiff's damages.  *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir. 1995) (en banc).  "[L]iability . . . is to be allocated among the parties proportionately to the comparative degree of their fault."  *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975).  "Apportionment is not a mechanical exercise that depends upon counting up the errors committed by both parties.  The trial court must determine, based upon the number and quality of faults by each party, the role each fault had in causing the collision."  *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 370 (5th Cir. 2006).

It was appropriate for the district court to find that Weeks bore a substantial portion of the responsibility because Weeks was operating the G.D. MORGAN at the time of the accident and the risk of causing substantial damage far outweighed the burden of downloading updated NOAA charts and using local notices to mariners to check for new pipelines.  The fact that Weeks followed the custom of the dredging industry is not dispositive, because a common practice can still be negligent.[25]  Moreover, the Eastern District of

---

[25] *See, e.g.*, *Gunn v. Mid-S. Health Dev., Inc.*, No. 99-40601, 211 F.3d 126 (table), 2000 WL 309995, at *1 (5th Cir. Mar. 8, 2000) (per curiam) (stating that under Texas tort law, "conformity with the usual and customary practices of an industry does not, as a matter of law, absolve a party from negligence"); RESTATEMENT (SECOND) OF TORTS § 295A cmt. c (1965) ("[C]ustom is . . . not necessarily conclusive as to whether the actor, by conforming to it, has exercised the care of a reasonable man under the circumstances . . . .  No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, or money, to set its own uncontrolled standard at the expense of the rest of the community.  If the only test is to be what has always been done, no one will

No. 14-20265

Louisiana previously found a dredger liable for 50% of a pipeline owner's damages under similar circumstances. *See S. Natural Gas*, 711 F.2d at 1252 n.2. Considering Weeks's negligence and that caselaw, the district court did not clearly err in finding Weeks 40% liable.

    AFFIRMED.

---

ever have any great incentive to make any progress in the direction of safety."); SCHOEN-BAUM, *supra* note 8, § 14-2 ("Custom . . . no matter how well entrenched, is not a rule of law that is invariably applied.").

No. 14-20265

PRISCILLA R. OWEN, Circuit Judge, concurring in part and dissenting in part:

I agree that Weeks Marine, Inc. (Weeks) was properly found liable by the district court for damages that Contango Operators, Inc. (Contango) suffered. However, I do not join in the disposition of the Government's appeal. I disagree with the panel majority's interpretation of the exculpatory clause in the permit that the United States issued to Contango under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

Section 10 of the Act prohibits the creation of any obstruction in the navigable waters of the United States unless the proposed project has been recommended by the chief of the Army Corps of Engineers (the Corps) and authorized by the Secretary of the Army. Contango desired to build a natural gas pipeline in the Gulf of Mexico that would cross the Atchafalaya Pass Channel, a shipping channel that leads from the Gulf of Mexico into the port of Morgan City, Louisiana. Contango applied for and the Government issued a permit allowing the construction of the pipeline.

There is an exculpatory clause in the permit which provides:

> 3. Limits of Federal Liability. In issuing this permit, the Federal Government does not assume any liability for the following:
>
> . . .
>
> b. Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.

After the pipeline was constructed, the Corps undertook dredging operations in the Atchafalaya Pass Channel and awarded the dredging contract to Weeks. The plans and specifications prepared by the Corps and provided to Weeks specified the location of five pipelines in the Channel but did not include Contango's pipeline. Weeks' dredge struck Contango's pipeline,

resulting in an explosion and fire. The pipeline was inoperable for 35 days. Contango sued Weeks and the Government for damages, contending that the Government was negligent in failing to identify the existence and location of Contango's pipeline on the specifications provided to Weeks.

In holding that this incident did not come within the exculpatory clause in the permit issued by the Government to Contango, the district court placed great weight on the term "assume." The version of the exculpatory language that had appeared in Section 10 permits prior to the version at issue in this suit had provided that "the United States shall in no case be liable for any damage or injury to the structure or work herein authorized."[1] The district court concluded that "assume" means that the Government does not "take on liability" while the older language indicated that the Government "is not liable for [any] damages" and that the two concepts were distinct.

The panel majority opinion also places considerable weight on the term "assume," concluding that the phrase "assume any liability" "refers only to taking on new liability."[2] The majority opinion concludes that "the clause means that the permit or its issuance does not provide a basis for liability for the types of damages listed; it does not suggest the government is protected from existing sources of liability independent of the permit."[3]

With great respect, I have difficulty following this explanation. The "types of damages listed" in the permit are quite broad. The damages identified are "[d]amages to the permitted project [Contango's pipeline] or uses [of Contango's pipeline] as a result of current or future activities undertaken

---

[1] 33 C.F.R. § 209.130(c)(2)(vii) (1974).

[2] *Ante* at 8.

[3] *Id.*

by or on behalf of the United States in the public interest." The reference to "current or future activities undertaken by or on behalf of the United States in the public interest" is also quite broad. That reference is not limited to activities that relate only to the permit.

Even giving the word "assume" a cramped meaning, the Government had no duty to Contango under admiralty law until the Government issued the permit to Contango allowing the pipeline to obstruct navigable waters. The exculpatory clause, fairly read in context, states that in exchange for allowing Contango to construct and operate a natural gas pipeline in navigable waters, the Government is not assuming, that is "taking on," liability that it would not have had but for the issuance of the permit. In other words, since the only reason that the Government had any duty under admiralty law regarding the pipeline is because the pipeline is in navigable waters, the exculpatory clause says that by allowing the pipeline to exist in navigable waters, the Government does not assume *any* liability for damages to the pipeline "as a result of current or future activities undertaken by or on behalf of the United States in the public interest." This is an express disclaimer of liability for the Government's own activities, both at the time the permit was issued and *in the future* that damage this pipeline.

The majority opinion relies on a decision of the Court of Federal Claims regarding the Section 10 exculpatory clause.[4] That was a takings case that is inapposite. In *Banks v. United States*, owners of property located on the shores of Lake Michigan contended that the Government's activities in St. Joseph Harbor had resulted in erosion and that their properties were receding at a

---

[4] *See id.* at 8 n.13.

rate of two feet per year.[5]  There were two components of the claims at issue. One was that the Government had installed steel sheet pilings at the St. Joseph Harbor, which the plaintiffs asserted "created a wall blocking the sand that otherwise would have traveled south and protected the shoreline [south of St. Joseph Harbor] from erosion."[6]  The second component was that in an attempt to mitigate the erosion, the plaintiffs had placed shore protection, called "revetments," on their properties.[7]  The Government contended that it was not liable for erosion that the revetments caused.[8]  In order to construct the revetments, the plaintiffs had obtained permits under Section 10 of the River and Harbor Act of 1899.[9]  A threshold issue in the case was whether the erosion caused by the revetments, as distinguished from erosion caused by the steel sheets installed in the harbor, constituted inverse condemnation and therefore constituted a taking rather than a tort.[10]  The court held that if the facts alleged by the plaintiffs were proven at trial, the erosion caused by the revetments would be a taking rather than a tort.[11]  In this context, the Government then argued that it was not liable for the erosion caused by the revetments because of the exculpatory clause in the Section 10 permits.[12] Unsurprisingly, the Court of Federal Claims concluded that the exculpatory clause was not applicable to a constitutional takings claim.  The court said, "it

---

[5] 69 Fed. Cl. 206, 207-08, 214 (2006).

[6] *Id.* at 210 (alteration in original).

[7] *Id.* at 208.

[8] *Id.*

[9] *Id.* at 214.

[10] *Id.* at 212-14.

[11] *Id.* at 214.

[12] *Id.*

is not legally relevant here whether [the Government] 'assume[s]' liability or not."[13]    This meant that the court did not even consider *whether* the Government assumed liability under the exculpatory clause, much less *what* liability the Government had assumed under that clause.  Citing a takings case that held the Government is liable for the cost of protective measures taken by property owners to prevent erosion caused by the Government, the Court of Federal Claims said, "[u]nder *Dickinson,* [the Government] is liable for all that has been taken as a result of its activities; there is no liability for the government to 'assume.'"[14]    This discussion does not support the panel majority's interpretation of the exculpatory clause; it holds only that an exculpatory clause in a Section 10 permit does not apply when the Government has taken a private owner's property for public use without compensation, in violation of the Constitution.  The fact that the revetments that caused part of the erosion were authorized by a Section 10 permit had nothing to do with the fact that the initial erosion was caused by the Government and it would be liable for that erosion as well as the protective measures taken by the plaintiffs.

The present case is not a takings case.  It is a tort case.  The tort committed by the Government caused "[d]amages to the permitted project [Contango's pipeline] . . . as a result of current or future activities undertaken by or on behalf of the United States in the public interest."  The exculpatory clause applies.

---

[13] *Id.* at 217 (second alteration in original).

[14] *Id.* (citing *United States v. Dickinson*, 331 U.S. 745, 750 (1947) (holding that when the Government takes property by flooding it, the Government is also liable for the cost of protective measures by landowners in preventing erosion caused by raised water levels)).

No. 14-20265

* * * * *

For the foregoing reasons, I concur in part and dissent in part.